IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHRISTOPHER BARAJAS,

    Petitioner,　　　　　　　　　No. CIV S-01-1572 RRB JFM P

    vs.

MIKE KNOWLES, Warden,

    Respondent.　　　　　　　　　FINDINGS AND RECOMMENDATIONS

         Petitioner is a state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 1998 conviction on charges of kidnapping with intent to commit rape or forcible oral copulation, sexual battery, two counts of forcible oral copulation, penetration of a genital opening with a foreign object, and forcible rape. It was also alleged that petitioner committed counts III through VII under circumstances requiring a 25 year to life sentence. (CT 6-10, 77.) Petitioner was sentenced to a total unstayed determinate term of 16 years on Counts III (6 years), IV (2 years), VI (2 years), and VII (6 years), and to an indeterminate term of 25 years to life on Count V. The midterm of 8 years on Count I was stayed pursuant to Cal. Penal Code S 654. By his traverse, petitioner elected to proceed solely on claim number one in the petition, that petitioner's conviction was based upon false evidence submitted at trial, in violation of his right to a fair trial. (February 14, 2007 Traverse at 2.)

PROCEDURAL HISTORY

1. Petitioner appealed his conviction on July 13, 1998. (CT 194-95.) On June 2, 2000, the judgment was affirmed by the Third District Court of Appeal. (Answer, Ex. D.)

2. On July 10, 2000, petitioner filed a petition for review with the California Supreme Court. (Answer, Ex. E.) On August 16, 2000, the petition was denied. (Answer, Ex. F.)

3. On August 14, 2001, petitioner filed the instant petition.

4. On June 3, 2004, present counsel substituted in as counsel for petitioner due to the death of petitioner's prior attorney.

5. On August 9, 2004, this action was stayed pending exhaustion of unexhausted claims.

6. On December 8, 2004, petitioner filed a state habeas petition in the Sacramento County Superior Court, Case No. 04F10808. (December 9, 2004 Notice.) On February 1, 2005, that petition was denied.[1]

7. On December 8, 2006, petitioner confirmed that the Sacramento County Superior Court denied the state habeas petition, finding that the petition had been presented in an untimely manner based on delay which occurred prior to present counsel being retained. (Id. at 2 [docket no. 32].) Counsel attempted to discover a satisfactory explanation for the delay but was unable to do so. (Id.)

8. On December 14, 2006, the stay was lifted, the instant action was reopened, and petitioner was granted additional time in which to file a traverse. Petitioner's traverse was filed February 14, 2007.

---

[1] This information was obtained from the Sacramento County Superior Court's Index Search System, accessed February 4, 2008, as follows:
https://services.saccourt.com/indexsearchnew/xCaseDetailsV2.aspx?SearchValues=BARAJAS,CHRISTOPHER,%20,2838036,3410004F10808.

FACTS[2]

About 8:00 p.m. on October 25, 1997, [the] 15-year-old [victim] left the apartment where she was staying and headed toward Fat Ducks, a pizza parlor, a five to ten minute walk. As she walked through the Food Source parking lot, [petitioner] who was in a small black car asked her to "come here and talk to me for a minute." She ignored him and continued to walk. [Petitioner] drove alongside her and ordered her at gunpoint to get in the car. She did so. He drove off and eventually stopped in a covered parking space at a medical building.

[Petitioner] told [the victim] to feel the gun and when she did, he told her to do as he said and he would not have to use it. He ordered her to remove her shirt, she reluctantly did so and he felt her breasts. He took off his black windbreaker pants and turquoise briefs and demanded that she "go down" on him. He forced her head down and she orally copulated him. [Petitioner] removed [the victim's] pants and jammed his fingers in her vagina. She told him to stop but he continued. [Petitioner] reclined [the victim's] seat and climbed on top of her. When he put his penis in her vagina, she felt stabbing pains. She had never before had intercourse. She told him no but he continued. He pulled his penis out, put [the victim's] leg on the dashboard and then put his penis in her vagina a second time. When he stopped, he got out and urinated in a bush. [The victim] did not run because it was a secluded area and she did not know how to drive a stick shift. When [petitioner] returned, he had [the victim] orally copulate him. [The victim] pulled back and [petitioner] ejaculated. He used some napkins in the car to wipe himself off and then threw the napkins on the ground.

[Petitioner] reached into the back seat, unzipped something and handed [the victim] a piece of Juicy Fruit gum; she put the wrapper in the ashtray. While driving back toward Fat Ducks, he asked her for her phone number. She was nervous and did not think to give him a fake number. She gave him her number but did not want him to call her. He laughed and asked how she would feel if she learned the gun was a water gun.

[Petitioner] dropped [the victim] off at the pizza parlor. [The victim] told her girlfriend that she had been raped. [The victim's] friends took her back to the area where she had been raped and then to the hospital where the police were summoned.

About 11:30 p.m. on October 25, 1997, Sacramento Police Officer Pete Diaz went to the hospital and interviewed [the victim].

---

[2] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Barajas, No.C030151 (June 2, 2000), a copy of which is attached as Exhibit D to Respondent's Answer, filed October 5, 2001.

3

|   |   |
|---|---|
| 1 | She told the officer that she had been a virgin. Officer Diaz drove [the victim] to the rape site where napkins and a gum wrapper were found in a parking spare. Officer Diaz then took [the victim] to UCD Medical Center (Center) for a sexual assault exam. |
| 2 | |
| 3 | |
| 4 | At 12:30 a.m. on October 26, 1997, Ana Rose, a physician's assistant and medical examiner with the sexual assault team at the Center, examined [the victim]. Ross concluded there were three tears in [the victim]'s hymen which were fairly recent due to the sharpness or acute nature of the tears and consistent with forcible intercourse. Ross took colposcopic photographs of the injuries which were reviewed by Dr. John McCann, an expert in the field of sexual assaults, and Kathy Boyle, a nurse practitioner. According to Rose, the photographs were of poor quality. |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | [The victim] had some bleeding from her genital area after going home. |
| 10 | The next day, [petitioner] was arrested after calling [the victim] and setting up a meeting where [the victim] positively identified him in an in-field show-up. A search of the Jeep [petitioner] had been driving revealed a plastic water gun painted black to resemble a 9 mm Glock semiautomatic handgun. Parked in [petitioner's] driveway, officers found the black car which [the victim] identified. There was Juicy Fruit gum wrapper in the ashtray. A search of [petitioner's] home revealed black nylon pants and turquoise briefs which [the victim] identified as the same or similar. |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | No fingerprint impressions of any kind were found on the inside or outside of the black car. No latent prints were found on the gum wrapper or on the water gun. The napkins found at the crime scene all contained semen which tested as "ABO" type "A," the same as [petitioner]. [The victim's] blood type if "B." The "PGM" of the semen suggested [petitioner] was a possible source of the semen. |
| 17 | |
| 18 | |
| 19 | [Petitioner] testified at trial. He offered [the victim] a ride and she accepted. He denied showing her anything before she got in and denied threatening her to get into the car. He drove around looking for the party [the victim] planned to attend. He parked the car, they talked to 10 to 15 minutes and then began kissing and touching each other. She helped him undo her pants. He tried to get on top of her but it was too cramped in the car. They continued to hug and kiss but it was awkward. She began masturbating him and he ejaculated into napkins which he threw into the parking lot. He wanted her to orally copulate him but she did not want to. He claimed they never had sexual intercourse. When he got out some cologne from his backpack, his squirt gun fell out and [the victim] held it. She gave him her phone number and address and when he dropped her off at the pizza parlor, she kissed him goodbye. When interviewed at the police station, he admitted that he had lied and |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |

4

      told officers he had been with a prostitute whom he had met on Stockton Boulevard.

      Dr. McCann reviewed the colposcopic photographs, the quality of the photographs was not up to usual standards but was adequate. He disagreed with Ross's conclusions concerning the age of the injuries. He believed any injuries were at least seven to ten days old, could have been years old, and already healed. He could not say that [the victim] had not been raped. An old injury could mask a new injury. He agreed that partial penetration could be painful and yet leave no injuries.

      After Dr. McCann testified, [the victim] was recalled to the stand. When she was 9 or 10 years of age, she had sexual intercourse a couple or times with her stepbrother who was at the time also a minor. The incidents were never reported to law enforcement and the issue was "buried." She had told the police she was a virgin because she had not consented to have sex.

(People v. Barajas, slip op. at 2-6.) Petitioner had no prior criminal record. (CT 172.)

## ANALYSIS

I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

5

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

II. Petitioner's Claims

   A. Unconstitutionality of AEDPA

In section II of petitioner's traverse, petitioner argues that because respondent contends that AEDPA applies and constrains this court's authority to grant habeas relief, respondent is urging an unconstitutional application of AEDPA. However, on July 9, 2007, the Court of Appeals for the Ninth Circuit held, *inter alia*, that the section of AEDPA limiting the grounds for federal habeas relief for prisoners convicted in state court does not violate the Suspension Clause or the separation of powers. Crater v. Galaza, 491 F.3d 1119 (9th Cir. 2007). This court is bound by that authority.

   B. Claim One

Petitioner's first claim is that he was denied a fair trial because petitioner's conviction was based upon false evidence submitted at trial. Essentially, petitioner argues that the prosecution presented false evidence by allowing the victim to testify that she was a virgin.

Petitioner also attempts to demonstrate the victim's testimony concerning her stepbrother's molestation was perjured. Petitioner provides investigator's reports from

1  interviews with Jabyne Trujillo, the stepbrother, who denies any penile contact with the victim

2  took place.  (Traverse, Statement Summary, at 1.)  Mr. Trujillo recalled he was about eight years

3  old at the time, while The victim was six years old.  Mr. Trujillo insisted it was all a fabrication

4  based on "playing like little kids play and experiment," "hugging, rubbing and 'play kissing.'"

5  (Id.)

>     Trujillo also stated that
>
>     in either 1997 or 1998 he received a call from Gary regarding the
>     instant case.  He recalled that Gary explained to him that "[the
>     victim] was raped," and that during a medical exam of Ford,
>     vaginal scar tissue was discovered that pointed to the fact that Ford
>     had intercourse prior to the alleged rape in the instant case.  Gary
>     stated to him that he had become aware of "things" that occurred
>     between he and Ford that he was never made aware of before.
>     Gary then told Trujillo that Ford stated earlier that he raped her.
>     Trujillo stated that he was uncertain as to what Gary was referring
>     to, but at Gary's request, agreed to speak to a person who Gary
>     identified as "our attorney."  While Trujillo agreed to speak to the
>     attorney, he advised Gary that he was going to tell the truth about
>     the fact that he never had sex with Ford at any time.  Gary then
>     stated to him that Ford was present and asked Trujillo if he would
>     speak to Ford.  He agreed, and when she came on the line, she
>     stated things such as, "I've forgiven you for the things you did."
>     Trujillo stated that he interrupted Ford and told her that he never
>     raped or had sex with her.  He said Ford came onto the phone line
>     and spoke in a soft, friendly voice, which he considered a bit odd
>     for someone who was accusing him of rape.  Trujillo recalled that
>     once he was off of the line with Ford, he never did speak to "the
>     attorney" who was allegedly waiting to speak to him.

19  (Id. at 2.)  On June 29, 2004, Trujillo signed a declaration under penalty of perjury stating he had

20  read the June 3, 2004 investigative report and that it accurately set forth the statement he gave to

21  Investigator John Kirkman.  (In re Christopher Barajas, 04F10808, Ex. D [docket no. 18].)

22       Petitioner also presents a telephone statement summary from the investigator's

23  telephone interview of Jackie Danette Ford, the victim's stepmother (and mother of Trujillo),

24  who described the victim as a "perpetual liar" and "felt strongly that [the victim] was sexually

25  active during high school."  (Traverse, Telephone Statement Summary at 1-2.)  Jackie Danette

26  Ford also recalled receiving a telephone call from her mother-in-law, Carlene Ford in 1997 or

7

1  1998.  (Id.)  Carlene told her that The victim had been raped and that doctors identified vaginal

2  scar tissue to indicate that The victim had sex prior to her allegation of rape at that time.  Carlene

3  asked her "Do you think that Jabyne would say that he had sex with [the victim]?"  (Id.)  Jackie

4  Danette was incredulous and immediately called Trujillo, who became upset at Carlene's request.

5  (Id.)

6          Petitioner provides a telephone statement summary from the investigator's

7  telephone interview with Gary Ford, Jr., the victim's brother, who

8
9
10
> stated that he was approximately thirteen years of age when his
> sister, [the victim] . . . alleged that his step brother, Jabyne Trujillo
> raped her.  He vaguely recalled hearing of the matter when he was
> thirteen.

11  (Traverse, Telephone Statement Summary at 1.)  "Gary remarked that based upon his knowledge

12  of Trujillo's character, the allegation of rape on the part of [the victim] 'is B.S.'"  (Id.)

13          Petitioner also provides a statement summary of the investigator's interview of

14  Donna Ford, the victim's aunt (Gary Ford Sr.'s sister).  (Traverse, Statement Summary, at 1.)

15  Donna stated she was aware that the victim had been "allegedly raped, but was uncertain as to

16  how long ago the incident occurred," and was "unaware of the outcome of the trial."  (Id.)  When

17  informed of the victim's claim that Jabyne had molested her, Donna responded "There is no way

18  that Jabyne molested [the victim]! . . . Jabyne is a sweet kid . . . who wanted something out of

19  life."  (Id.)  Donna "was certain that if something such as Jabyne molesting [the victim] occurred,

20  she would have known about it, and added that she was not aware of "a family cover up."  (Id.)

21          The last reasoned rejection of this claim is the decision of the California Court of

22  Appeal for the Third Appellate District on petitioner's direct appeal.  The state court rejected this

23  claim on the ground that:

24
25
26
> [Petitioner] next contends that the victim committed perjury in
> falsely testifying she was a virgin and the "prosecution below
> failed to correct the falsity by sugar coating the untruth and arguing
> it to the jury."  [Petitioner] argues the "[d]eliberate deception of a

/////

8

court and jurors by presentation of known false evidence is incompatible with 'rudimentary demands of justice.'"

On direct examination, the victim claimed she had never had sexual intercourse until she was raped by [petitioner]. Her testimony was consistent with her prior statements. Dr. Ross's report was also consistent with the victim's representation.

After Dr. McCann testified for the defense, the prosecutor spoke with the victim who revealed that when she was nine or ten years of age, she had been sexually molested by her stepbrother. They had engaged in sexual intercourse "[a] couple of times." She explained that she had considered herself a virgin because it had not been consensual.

[Petitioner's] right to a fair trial is violated when the government knowingly uses false evidence to convict (*Giglio v. United States* (1972) 405 U.S. 150, 153-154 [31 L.Ed.2d 104, 108]) or where the government, although it does not solicit the false evidence, does nothing to correct it when it appears. (*Napue v. Illinois* (1959) 360 U.S. 264, 269-270 [3 L.Ed.2d 1217, 1221].)

There is nothing in the record substantiating [petitioner's] claim that the prosecution knowingly used false evidence when it presented the victim's testimony on direct that she had never before had intercourse. The prosecution claimed he learned otherwise when he spoke with the victim after Dr. McCann testified. The prosecution's lack of knowledge is understandable in that the victim had consistently reported she was a virgin.

Perjury requires that a person testifying in court "states as true any material matter which he or she knows to be false." (§ 118.) In explaining that she considered herself a virgin because the sexual intercourse with her stepbrother had not been consensual, the victim was mistaken in her belief that she was a virgin but did not commit perjury. (See *People v. Von Tiedeman* (1898) 120 Cal. 128, 134-137.)

[Petitioner] claims in his reply brief that the prosecution knew about the victim's prior sexual activity as demonstrated by his cross-examination of Dr. McCann. The prosecutor asked Dr. McCann whether a tear would be present if "there had been some sort of trauma, even at an earlier age, four or five years or longer." [Petitioner] argues "litigators do not ask a question unless they already know the answer to it, unless you want the answer to blow up in your face."

[Petitioner's] speculation as to why a question was asked does not refute the prosecutor's representation that he learned after Dr. McCann's testimony about the prior sexual activity between the victim and her stepbrother.

9

> [Petitioner] further argues that the victim's testimony was "given the stamp of court approval, sugar coating the truth." [Petitioner] claims the prosecution and the court assisted the victim in covering the lie. [Petitioner] claims, "Correcting the falsity does not entail sugar coating it to obtain a conviction, but to elicit truth."
>
> The prosecution corrected the victim's testimony as required when false evidence appears, and the jury had to evaluate whether she was "sugar coating the truth." [Petitioner] has failed to demonstrate that his right to a fair trial was violated.

(People v. Barajas, slip op. at 11-14.)

A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial "fundamentally unfair." Darden v. Wainwright, 477 U.S. 168, 181-83, 106 S.Ct. 2464, 2471-72 (1986); Drayden v. White, 232 F.3d 704, 713 (9th Cir.2000), cert. denied, 532 U.S. 984, 121 S.Ct. 1630 (2001). "[A] conviction obtained by the [prosecutor's] knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397 (1976) (footnotes omitted); Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 766 (1972); Miller v. Pate, 386 U.S. 1, 7, 87 S.Ct. 785, 788 (1967); Hayes v. Woodford, 301 F.3d 1054, 1072 (9th Cir.2002). The same result obtains when the prosecutor, although not soliciting false testimony, allows it to go uncorrected when it appears. See Napue v. Illinois, 360 U.S. 264, 269 (1959); see also United States v. LaPage, 231 F.3d 488, 492 (9th Cir.2000) (if prosecutor knows that his witness has lied, he has a constitutional duty to correct the false impression of the facts).

"To prevail on a claim based on [the prosecutor's knowing use of false evidence], the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." United States v. Zuno-Arce, 339 F.3d 886, 889-90 (9th Cir.2003).

In the instant case, the victim's earlier testimony that she was a virgin was false; after the defense rested and the prosecution interviewed the victim further, the victim informed

1 the prosecution that the victim had been sexually molested by her stepbrother when she was a
2 young girl.  At that time, the prosecutor informed the court, attempting to take steps to correct the
3 record, as required under Napue.  The trial court, in an effort to correct the earlier testimony,
4 allowed the prosecution to recall the victim to the stand, at which point the prosecution clarified
5 that the victim misunderstood the meaning of the word "virgin," and the victim testified that her
6 stepbrother had forced her to have sex when she was about nine or ten years old, but only on a
7 couple of occasions, which she clarified was less than five times.  (RT 1068.)  The victim
8 confirmed, however, that her testimony concerning petitioner's acts were true and insisted
9 petitioner had raped her.

10    Petitioner has not demonstrated that the prosecution was aware that the victim's
11 prior claims to virginity were false at the time the victim testified she was a virgin.  Mere
12 speculation regarding the Napue factors is insufficient to meet petitioner's burden.  United States
13 v. Aichele, 941 F.2d 761, 766 (9th Cir. 1991).  See Marcella v. United States, 344 F.2d 876, 880
14 (9th Cir. 1965) ("Before a sentence may be vacated on the ground of perjured testimony, the
15 movant must show that the testimony was perjured and that the prosecuting officials knew at the
16 time such testimony was used that it was perjured."); See also Ortiz v. Stewart, 149 F.3d 923,
17 936 (9th Cir. 1998) ("If a prosecutor knowingly uses perjured testimony or knowingly fails to
18 disclose that testimony is false, the conviction must be set aside if there is any reasonable
19 likelihood that the false testimony could have affected the jury verdict.").  There is no violation
20 merely because a petitioner alleges that false or perjured testimony was introduced.  Murtishaw
21 v. Woodford, 255 F.3d 926, 959 (9th Cir. 2001).

22    The record reflects that the victim consistently reported she was a virgin.  The
23 victim's testimony that she was a virgin was consistent with the report of the medical
24 professional who performed the examination on the victim (Dr. Ross).  (CT 24, 27, RT 134, 236,
25 248, 263-64, 270, 639, 662.)  Petitioner also testified that the victim told him she was a virgin
26 (RT 722), although he later denied that she made such a statement (RT 828).

Petitioner attempts to demonstrate the prosecution's knowledge by pointing to the prosecution's cross-examination of Dr. McCann where it was asked whether a tear would be present if there had been trauma, even at an earlier age, four or five years or longer. But, as noted by the state appellate court, mere speculation as to the reason a certain question was asked is not sufficient to meet the factors required by Napue. In addition, both the prosecution and defense counsel were aware of Dr. McCann's report prior to trial.

However, the tipping point here is that petitioner has failed to show that there is a reasonable likelihood that the false testimony could have affected the verdict. Grigsby, 130 F.3d at 368. The trial court allowed the prosecutor to call the victim back to the stand where it was made clear to the jury that the victim was not a virgin at the time of the alleged rape. (RT 1058-70.) This rebuttal testimony corrected the record as required under Napue. Because the jury was so informed, petitioner was not prejudiced by the victim's earlier claim of virginity. At that point, it was up to the jury to decide whether the victim was credible.

The jury was instructed as to how to determine the credibility of witnesses. (CT 103-05.) The jury was also instructed that:

> [a] witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars.

(CT 106.) On the ninth day of trial, the jury started deliberating at 10:00 a.m. on April 28, 1998 until they reached their verdict at 9:45 a.m. on April 30, 1998, a little over two days later. The jury asked for read back of nurse practitioner Ana Ross' testimony. (CT 147.) Given the read back of Ms. Ross' testimony, the jury may have credited Ms. Ross, who performed the physical examination of the victim, over the testimony of Dr. McCann, who prepared a report disagreeing with Ms. Ross' conclusions after studying photographs.[3] "I had findings that I thought were

---

[3] The prosecution conceded in closing argument that Dr. McCann is the leading expert in this field and that the tear in the hymen was old. (RT 1305.)

acute on the live person." (RT 254.) She testified she could see acute injuries to the victim's hymen. (RT 264.) Ms. Ross testified that she was in the examination room and the lacerations were "fresh wounds." (RT 270.)

Petitioner has failed to demonstrate that the state court unreasonably applied Napue to the facts of this case. The state court's rejection of petitioner's first claim for relief was neither contrary to, nor an unreasonable application of, controlling principles of United States Supreme Court precedent. Petitioner's first claim for relief should be denied.

In addition, petitioner insists that the victim's changed testimony concerning the stepbrother was also false and claims that this means the victim falsely accused another of rape, which is key evidence petitioner was entitled to have presented at trial so the jury could properly assess the victim's credibility. To the extent that petitioner contends he is entitled to habeas relief because the victim lied when she testified she was molested by her stepbrother or when she claimed she was not otherwise sexually active, the claim also fails.

Even absent intentional misconduct by the prosecution, "[a] conviction based on false evidence warrants a new trial 'if there is a reasonable probability that the result of the proceeding would have been different.' " Spivey v. Rocha, 194 F.3d 971, 979 (9th Cir.1999) (citations omitted), cert. denied, 531 U.S. 995, 121 S.Ct. 488 (2000); Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir.2002), cert. denied, 537 U.S. 1179, 123 S.Ct. 992 (2003). A reasonable probability is a probability sufficient to undermine confidence in the outcome." United States v. Endicott, 869 F.2d 452, 455 (9th Cir.1989), citing United States v. Bagley, 473 U.S. 667, 678-80, 105 S.Ct. 3375, 3381-83 (1985). A petitioner must demonstrate that the newly discovered evidence would probably have resulted in the defendant's acquittal. Quigg v. Crist, 616 F.2d 1107, 1112 (9th Cir. 1980); see also Gordon v. Duran, 895 F.2d 610, 614-15 (9th Cir. 1990).

Petitioner has not presented evidence that the prosecution knew the victim was lying when she testified about the molestation or when she denied being sexually active. Rather, petitioner contends the newly-discovered evidence that the victim's testimony that her step-

brother Jabyne Trujillo had raped her is false is material and probative with respect to the following:

    1. The victim's credibility in general; because petitioner admitting having sexual contact with the victim and the defense was consent, so the victim's credibility is key;

    2. Petitioner is not the only person the victim falsely accused of sexual assault;

    3. The prosecution's attempt to explain the medical evidence concerning the victim's prior sexual activity was supported by false evidence; and

    4. The medical evidence demonstrates the victim was sexually active prior to her encounter with petitioner.

(Traverse at 6.)

Petitioner supports this claim by citing Redmond v. Kingston, 240 F.3d 590, 591-92 (7th Cir. 2001)(in habeas petition alleging violation of Confrontation Clause, "the fact that the girl had led her mother, a nurse, and the police on a wild goose chase for a rapist merely to get her mother's attention supplied a powerful reason for disbelieving her testimony eleven months later about having sex with another man, by showing that she had a motive for what would otherwise be an unusual fabrication."); DePetris v. Kuykendall, 239 F.3d 1057, 1062 (9th Cir. 2001)(in another Confrontation Clause challenge, "where a defendant's guilt hinges largely on the testimony of a prosecution[] witness, the erroneous exclusion of evidence critical to assessing the credibility of that witness violates the Constitution."); Franklin v. Henry, 122 F.3d 1270, 1273 (9th Cir. 1997)(concluding that, in a sexual assault case, trial court's exclusion of evidence of the complaining witness' prior false accusation of sexual assault was "error of constitutional magnitude" under the Constitution of the United States as it has been interpreted by the Supreme Court of the United States"); overruled on a different point in Payton v. Woodford, 346 F.3d 1204, 1218 (9th Cir. 2003)(en banc); United States v. Stamper, 766 F.Supp. 1396, 1405 (W.D. N.C. 1991)(In prosecution for statutory rape, Stamper moved for permission to introduce certain

/////

evidence. The motion was granted: "Evidence of prior false allegations is so probative of the central issue in a rape case that to exclude it might deny evidence critical to the defense.")

Here, however, this newly-discovered evidence does not undermine the court's confidence in the outcome. Dr. McCann testified that the victim's injuries were consistent with both a single episode and repeated sexual activity and that there was no way to distinguish between the two. (RT 1014-15.) The victim's claim to virginity was dispelled and the jury was informed that the victim had previously had sex. The victim attributed it to the molestation by her step-brother. But even if it turned out that the victim had prior sexual activity, it would not change the fact that the victim testified that her sexual contact with petitioner was not consensual, even after she returned to the stand to explain Dr. McCann's medical findings.

As noted by the state court, none of the offenses charged required the prosecution to prove that the victim suffered bodily injury during the alleged rape. (People v. Barajas, slip op. at 9.) Dr. McCann did not opine that the victim had not been raped or that forcible penetration of the genital opening with a foreign object, sexual battery or oral copulation did not occur. (Id. at 11.)

The record reflects that once the victim returned to the stand, she was questioned by the prosecution:

> Q. Can you look me in the eyes right here now and tell me that this man over here raped you on October the 25th?
>
> A. Yes.
>
> Q. Does this fact change any of your testimony that you told this jury earlier this week?
>
> A. No. No.
>
> Q. Did you tell them the truth about what had – had happened out there?
>
> A. Yes, I did.

(RT 1063.)

/////

Evidence that the victim was not testifying truthfully in all respects was already before the jury. Defense counsel argued that the victim lied: "She wasn't honest with Detective Barsotti. She wasn't honest with Detective Diaz. She wasn't honest with Mr. Sawtelle (the prosecutor)." (RT 1245.) Defense counsel pointed out the untenable position that the victim's change of testimony presented:

> Now, she knows that she can't lie about this because we have expert evidence that she's lying about it. So what does she tell you? Well, now she comes in here and she gives you another truth. Now she's going to tell you the real truth. Now, you know, forget about what she said earlier. Now she wants to tell you the real truth. The real truth is that she was molested and that she was molested when she was 9 or 10.
>
>   Well, it's kind of late in the ball game. We're at the end of this case. There's really no way for us on the defense to somehow be able to go back 9 or 10 years now and determine whether or not that's true or not. It's really difficult, and I think it would be an impossible burden to place upon us to prove that she's lying to you.

(RT 1248.) The defense pointed out that her testimony as to the location of the gun varied from her statements to the police about the location of the gun. (RT 1253-56.)

>   In this case, again, you're going to have to examine all of the testimony. You're going to have to. You're going to decide whether the truth favors Mr. Barajas or the truth favors [the victim]. You're going to have to judge the credibility of both witnesses.
>
>   So far, I spent a great deal of time going over all of the discrepancies, all the inconsistencies, all the lies that you heard from [the victim], . . . .

(RT 1273.)

Thus, petitioner's claim viewed as one of newly discovered evidence is no more meritorious. Even assuming arguendo that the Due Process Clause was implicated by the existence of newly discovered evidence, and assuming that the evidence in this case was "newly discovered" and not just additional proof of fabricated testimony, petitioner has failed to show that this new evidence would probably have resulted in his acquittal. As discussed above, the jury was made aware that the victim had previously had sex, which was confirmed by Dr.

16

McCann, and the victim was cross-examined as to the truth of her charges against petitioner. Additional evidence that the victim might not have been molested by her stepbrother would not likely have resulted in an acquittal, particularly in light of Ms. Ross' testimony concerning the victim's mental state and fresh injuries following the alleged rape.

Petitioner has not shown that prosecuting officials knew at the time the victim's testimony was used that it was perjured, or that the "new" evidence regarding the victim's claim she was molested by Trujillo would probably have produced an acquittal. Accordingly, this claim should also be denied.

### Request for Evidentiary Hearing

Petitioner requests an evidentiary hearing on his claims. Title 28 U.S.C. § 2254(e)(2) sets forth the circumstances under which a habeas petitioner is entitled to an evidentiary hearing. Under the statutory scheme, a district court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support a petitioner's claims and, if not, whether an evidentiary hearing "might be appropriate." Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999). See also Insyxiengmay v. Morgan, 403 F.3d 657, 669-70 (9th Cir. 2005). Petitioner has not demonstrated that any additional facts need be determined for a fair resolution of the merits of any of his claims. Thus, petitioner has failed to overcome the initial hurdle identified above.

Even assuming arguendo that additional facts need be determined and that petitioner did not receive a full hearing in state court despite his best efforts, petitioner has not demonstrated that an evidentiary hearing is required. A state habeas petitioner is entitled to an evidentiary hearing on a claim only if he alleges "facts that, if proven, would entitle him to relief." Turner v. Calderon, 281 F.3d 851, 890 (2002) (quoting Tapia v. Roe, 189 F.3d 1052, 1056 (9th Cir. 1999)) ("[e]ntitlement to an evidentiary hearing based on alleged ineffective assistance, for example, requires a showing that if his allegations were proven at the evidentiary hearing, deficient performance and prejudice would be established"). See also Townsend v.

17

Sain, 372 U.S. 293 (1963) (a defendant is entitled to a federal evidentiary hearing on his factual allegations only if the merits of the factual dispute were not resolved in the state hearing, the state factual determination is not fairly supported by the record as a whole, the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing, there is a substantial allegation of newly discovered evidence, the material facts were not adequately developed at the state-court hearing, or for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing).  As discussed above, petitioner has failed to demonstrate that he is entitled to relief on his claims in this court.  Further, this court has determined that relief as to petitioner's claims should be denied on the merits because the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, an evidentiary hearing is not warranted.  See Williams, 529 U.S. at 445.

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 14, 2008.

UNITED STATES MAGISTRATE JUDGE

001; bara1572.157